## In re INTERNATIONAL MINERAL CO.

(District Court, D. Connecticut. April 19, 1915.)

No. 2033.

1. BANKRUPTCY ⮌269—SALES BY TRUSTEE—RESCISSION.

A trustee in bankruptcy entered into an option agreement with T. for the sale of the bankrupt's interest in certain talc quarries to the A. Co., to be organized by T., which company was to execute a mortgage to secure bonds which, with the exception of bonds in the sum of $15,000, were to be sold and the proceeds paid to the trustee. Such option having lapsed, a new option agreement, with the approval of the referee and a committee of the creditors, was made for the sale of the property to the A. Co. for $70,000, $7,500 to be paid by a specified date, and the balance to be se-

cured by bonds secured by a mortgage, the trustee to convey only such title as he had. The petitioners, acting for a syndicate, agreed to furnish T. the $7,500, for which they were to be repaid $15,000, and as security were to receive bonds in the sum of $250,000 and stock of the A. Co. The trustee had no knowledge of this agreement. The trustee, T., one of the petitioners, and others met for the purpose of paying the $7,500, and it was then agreed that bonds in the amount of $25,000 were to be retained from those delivered to secure the trustee. Certified checks for the $7,500 were given the trustee, and he signed a receipt agreeing to hold them in escrow until delivery of the deed, and to have the option contract amended to permit the retention of bonds in the sum of $25,000. There was no agreement between him and the petitioners, and he intended to deal solely with T. and the officers of the A. Co. The trustee deposited the checks in his account as trustee, and they were paid. The change in the option agreement was not approved by the referee or the creditors' committee, and a new agreement, providing for the retention by T. of bonds in the sum of only $15,000, was executed, under which a conveyance to the A. Co. was made and delivered to a trust company as required by the option. The petitioners knew of the new option agreement, but never demanded the return of the $7,500 until nearly three years after the conveyance, and the property in the meantime had become subject to attachments in suits by creditors of the A. Co. *Held*, that the petitioners were not entitled to the return of such money, as the trustee took the checks burdened with no trust, especially as they were certified checks, and the equivalent of cash, and the provision that they were to be held in escrow was ineffective, as they were delivered to the payee therein named, and the delivery could not be conditional, but was either absolute or void, and, there being no agreement that they should be returned if the agreement evidenced by the receipt was not carried out, the failure to secure the approval of such agreement by the referee and creditors left the old option in force.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 370; Dec. Dig. 🗝️269.]

**2. BANKRUPTCY 🗝️269—SALES BY TRUSTEE—RESCISSION.**

There was no fraud on the part of the trustee in transferring the checks to his account as trustee, as he did no more than he had a right to do, and was under a duty to the creditors of the estate to do, especially in view of Gen. St. Conn. 1902, § 4356, which is declaratory of the common law, and which provides that a check must be presented for payment within a reasonable time after its issue, or that the drawer will be discharged from liability thereon to the extent of the loss caused by the delay.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 370; Dec. Dig. 🗝️269.]

**3. BANKRUPTCY 🗝️269—SALES BY TRUSTEE—RESCISSION—"LACHES"—"EQUITABLE ESTOPPEL."**

It being impossible, by rescinding the transaction and returning the consideration received by each party, to place both parties in the same situation as when the contract was made, the failure of the petitioners to rescind promptly, unconditionally, and unevasively, whether regarded as "laches," which consists in inexcusable delay in asserting a right, inexcusable negligence, and inattention to one's interests, or "equitable estoppel," involving conduct inducing another to believe and act to his prejudice, defeated a rescission, especially as the contract was made with T., and not with the petitioners, who merely loaned money to T.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 370; Dec. Dig. 🗝️269.

For other definitions, see Words and Phrases, First and Second Series, Estoppel in Pais; Laches.]

---

🗝️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. EQUITY &c158—ESTOPPEL &c110—LACHES—NECESSITY OF PLEADING.**

A court of equity, in its discretion, may deny relief on the ground of laches or equitable estoppel, though neither is pleaded as a defense.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 395; Dec. Dig. &c158; Estoppel, Cent. Dig. § 300; Dec. Dig. &c110.]

In Bankruptcy. In the matter of the International Mineral Company, bankrupt. On petition for review of an order of the referee denying the application of Frank W. Cavanaugh and another for the payment to them of money in the trustee's possession. Order affirmed.

Marvin M. Taylor, of Worcester, Mass., for petitioners.

Ralph H. Clark, Arnon A. Alling, and John Q. Tilson, all of New Haven, Conn., for respondents.

THOMAS, District Judge. This is a petition to review an order of the referee in bankruptcy denying the right of Frank W. Cavanaugh and Paul Potter, members of the Massachusetts bar, to $7,500 held by the trustee of the International Mineral Company, a bankrupt corporation, in a petition filed by them under subdivision 7 of section 2 of the Bankruptcy Act of July 1, 1898, c. 541, 30 Stat. 546 (Comp. St. 1913, § 9586).

The order sought to be reviewed was entered on December 15, 1913, and contemporaneously with the filing of this order the referee filed a written memorandum in the form of a letter to the counsel for Cavanaugh and Potter and the trustee, respectively, setting out the reasons for the order, but made no detailed finding of facts or summary of the evidence. Hence a detailed statement of the facts found by the court is set out at length and is as follows:

This corporation was organized under the laws of the state of Maine, but its affairs and principal business were conducted in this district. On June 15, 1908, it was adjudicated a bankrupt by the District Court for this district, and on July 14, 1908, proceedings were had in which Felix Chillingworth was appointed and qualified as its trustee. Mr. Chillingworth continued to act as trustee until his death in February, 1914, and his successor was thereupon appointed, who accepted said trust and qualified and continued the duties of administering the estate until some time in July, 1914, when he resigned. Thereupon the present trustee was appointed and qualified, and is now such trustee. The funds in controversy are now on deposit in the name of the trustee in an approved depository.

Cavanaugh and Potter, who resided in Worcester, began proceedings of review, and to that end filed this petition; but before the referee had filed any finding, other than the memorandum referred to, he died. His successor, acting under an order of the District Judge, entered upon the stipulation of counsel for the respective parties, thereupon transmitted all of the proceedings had before the referee, including a stenographic report of all the evidence and the documents produced in evidence, or copies thereof. No question is made as to the finality of the referee's order denying the original petition, excepting as it may be reviewed.

The bankrupt corporation, at the time of said adjudication and for a considerable time previously, conducted talc quarries located at Moretown, Vt., and Ticonderoga, N. Y., and in connection with its business owned quarry properties made up of real estate and sundry interests therein and personal property at the places named. Following the adjudication, to wit, on October 12, 1908, Mr. Chillingworth entered into an option contract with one John W. Taylor for the sale of the interest of the bankrupt estate in said properties for a cash payment of $7,500, to be made on or before December 15, 1908. The terms of said option included a conveyance by said trustee, to be approved by the referee and a committee of the creditors, to a corporation which Taylor was to organize, and which, as soon as its organization was completed, was, in consideration of the conveyance to it, to execute a trust mortgage to secure an issue of bonds which were to be held by the New Haven Trust Company—with the exception of bonds of the par value of $15,000—to be sold from time to time under certain conditions expressed in said option until a sum should be realized sufficient to satisfy all of the allowed claims presented against the bankrupt. Subsequently this option was extended by the agreement of the parties and expired unexecuted on May 1, 1909.

In the meantime Mr. Taylor had effected the organization of this corporation, the American Quarries Company, under the laws of the state of Maine, with a capital stock of $2,000,000, and after such corporation was completed, on March 24, 1909, Mr. Taylor appeared at a special meeting of the board of directors of the American Quarries Company held at Boston, and stated that he had facilities for acquiring all of said bankrupt estate upon the payment to him or his representatives on or before July 1, 1909, of $8,000, and of $62,000 on or before December 14, 1909, and the issuing and turning over to him of 2,000 fully paid shares of the capital stock of the American Quarries Company and the delivery to him of $350,000 of first mortgage 6 per cent. coupon bonds of said company, secured by a trust mortgage upon the said quarry properties of the bankrupt corporation.

Some six weeks later, on May 4, 1909, Mr. Chillingworth and Mr. Taylor executed an agreement whereby the latter released all right under the option of October 12, 1908, and which had then expired, for the purchase of said bankrupt's estate from Mr. Chillingworth, as trustee, and on said May 4, 1909, with the approval of the referee and the committee of the creditors of the International Mineral Company, Mr. Chillingworth entered into an option agreement with one Guy C. Holliday, who was acting in behalf of Mr. Taylor, for the sale of said property of said bankrupt estate to the American Quarries Company for the sum of $70,000, $500 of which was paid by said Holliday at the time of the execution of said option, and $7,500 of which was to be paid on or before the 1st day of July, 1909, the balance of said purchase price, amounting to $62,000, to be secured by $985,000 worth of bonds of the American Quarries Company, these bonds to be secured by a trust mortgage of said properties deposited with the New Haven Trust Company. One of the terms of the option provided that Mr. Chillingworth was to convey to the American Quarries Company such title only as he might have as trustee to the

property described. On June 23, 1909, Cavanaugh and Potter, acting as trustees for certain subscribers to a syndicate agreement of that date, and for the purpose of raising the sum of $7,500 to be furnished Mr. Taylor, and to be paid by the latter to Mr. Chillingworth upon said conditions, entered into an agreement with Mr. Taylor and with the subscribers to the syndicate, pursuant to which the sum of $7,500 subscribed was to be paid to Mr. Chillingworth by Cavanaugh and Potter upon receipt from the American Quarries Company of a binding and valid agreement, guaranteed by Mr. Taylor, for the payment to Cavanaugh and Potter on or before July 1, 1910, for said sum of $7,500, the sum of $15,000, to secure which Cavanaugh and Potter should receive a bill of sale of 5,000 tons of marketable talc then lying in piles at Moretown, Vt., and which was to be sold under certain conditions and the proceeds applied to the payment of the loan made by Cavanaugh and Potter. Mr. Chillingworth had no knowledge of this agreement or these facts until June 21, 1912, when Cavanaugh and Potter filed their petition demanding the turning over to them by Mr. Chillingworth of $7,500.

Contemporaneously with this agreement, Cavanaugh and Potter, as individuals, made another agreement with Mr. Taylor, and of which Mr. Chillingworth was ignorant until June, 1912, pursuant to which Mr. Taylor agreed, among other things, to cause $250,000 of bonds or interim receipts therefor, and $125,000 of the stock of the American Quarries Company, to be issued to Cavanaugh and Potter in order to enable them to better secure the subscribers to said syndicate agreement, Cavanaugh and Potter retaining absolutely for their services $150,000 of the bonds and $7,500 of the stock. A week later, on June 30, 1909, Cavanaugh and Potter, as individuals, made another agreement with Mr. Taylor, whereby the latter agreed that he would cause either Cavanaugh or Potter to be elected as a director of the American Quarries Company, and guaranteed that the salaries of the officers of said American Quarries Company should not exceed certain sums therein specified until Cavanaugh and Potter, as trustees, had been paid $15,000, as specified in the syndicate agreement above referred to. Mr. Chillingworth had no knowledge of either of these agreements until June 21, 1912.

On June 30, 1909, at the request of Mr. Taylor, Mr. Chillingworth went to Boston to receive the sum of $7,500 to be paid under the terms of the option agreement with Holliday, and which had been executed on May 4, 1909. It is clear, from the evidence, that at this time there was a definite understanding and agreement between all of the parties concerned that Mr. Chillingworth's title as trustee to the property of the bankrupt should be conveyed to the American Quarries Company in execution and performance of the option contract of May 4, 1909, entered into between Mr. Chillingworth and Mr. Holliday; and it was also known at that time, and for a considerable time prior thereto had been understood by all the parties interested, Mr. Taylor, Mr. Chillingworth, and Mr. Holliday, that Mr. Chillingworth could not give a good title to a certain portion of the real estate in New York by reason of the pendency of a suit brought to foreclose a mortgage thereon, and which was then pending in the Supreme Court of New York. Cavanaugh and

Potter as early as September, 1909, had actual knowledge of this defect in title. It was believed, however, by all the parties, that upon appropriate proceedings in the New York courts the cloud upon the title could be removed, and the understanding of Mr. Chillingworth, Mr. Holliday, Mr. Taylor, and the American Quarries Company was definite that Mr. Chillingworth's deed of conveyance should include only such title or equitable interest as he had in said property.

When Mr. Chillingworth arrived in Boston on June 30, 1909, Mr. Taylor informed him that the sum of $7,500 to be paid was to be furnished by certain parties from Worcester, who were to be interested in the American Quarries Company; that they would not arrive in Boston until that afternoon, and that he (Taylor) desired to retain bonds to the amount of $250,000. Up to that time Mr. Chillingworth had no knowledge from whom Mr. Taylor was to get this $7,500. On the afternoon of that day, June 30, 1909, Mr. Chillingworth and Mr. Hutchinson, the latter an employé of the New Haven Trust Company, went to the office of Louis A. Chandler, who was the secretary of the American Quarries Company and Mr. Taylor's attorney, where they were joined by Mr. Taylor, Mr. Potter, and certain officers of the American Quarries Company. A discussion then took place as to the retention of a larger amount of bonds than the amount of $15,000, which, under the terms of the later option of May 4, 1909, it was stipulated should be retained, and the representation was made to Mr. Chillingworth that it was necessary that bonds should be retained to the amount of $250,000. There was also at this time a discussion as to changes in the deeds of conveyance of the Moretown and Ticonderoga properties by Mr. Chillingworth, as trustee, to the American Quarries Company (drafts of which had previously been prepared), with respect to certain boundaries, and a further discussion as to what kind of title Mr. Chillingworth, as trustee, would convey to the American Quarries Company. Mr. Chillingworth then repeated the statement that he would and could convey only such title as he then had as trustee in bankruptcy, and the evidence justifies the finding that no representations were made by him that he then had as trustee a good and clear title to all the Ticonderoga property. No claim was made by Cavanaugh and Potter, or by any one, that the $7,500 to be paid in cash was a trust fund, or that said Potter was acting as trustee of said fund. Mr. Potter had with him at that time both the syndicate agreement and his contract with Taylor, of June 23, 1909; but he did not disclose that fact to Mr. Chillingworth, nor did he state or make known to him in any manner the terms or conditions thereof. No disclosure was made to Mr. Chillingworth how the money was raised, nor who the parties were who furnished the money, nor the terms or conditions under which said money had been raised, nor that Mr. Potter and the interests represented by him were separate and distinct from those of the American Quarries Company. A discussion as to the form of receipt to be given for the sum of $7,500 followed. Mr. Chillingworth dictated a draft of a receipt to a stenographer who was present, and after some discussion it was changed, and was finally signed by Mr. Chillingworth upon his stating that the conditions thereof as to the amount of bonds to be retained was subject in all respects to the approval of said referee and

the committee of creditors, and that, unless so sanctioned, the Holliday agreement of May 4, 1909, would remain in full force and effect.

As a vital point of this controversy centers very largely about this receipt, which was satisfactory to all parties, it is set out in full as follows:

"Boston, Mass., June 30, 1909.

"To the President and Officers of the American Quarries Company—Gentlemen: 1 hereby acknowledge receipt of certified checks for seventy-five hundred dollars ($7,500), payable to my order as trustee in bankruptcy of the International Mineral Company, which checks I will hold in escrow until I have delivered to the American Quarries Company proper deeds and conveyances of the property of said International Mineral Company, which are to be amended to conform to the present conditions. It being understood that the said property shall be conveyed to the American Quarries Company under the same terms as set forth in the option contract of May 4, 1909, with Felix Chillingworth, trustee, except that said option shall be so amended as to permit the party of the second part to retain two hundred and fifty thousand dollars ($250,000) par value of the first mortgage bonds of said company, but which two hundred and fifty thousand dollars ($250,000) of bonds are not to be sold prior to July 1, 1911.

"Yours very truly,                                Felix Chillingworth,
"Trustee of the International Mineral Company."

No objection was made by Mr. Taylor, or any officer or representative of the American Quarries Company, or by Mr. Potter, or indeed by any one, as to the form or substance of this receipt. Immediately thereafter Mr. Potter delivered to Mr. Chillingworth his individual certified check for $5,140. Mr. Cavanaugh's certified check for $2,000, and an uncertified check of Guy C. Holliday for $360. Mr. Chillingworth then handed these checks to Mr. Hutchinson, who took them, and Mr. Hutchinson, with these checks in his possession, then left the conference and immediately returned to New Haven and delivered them to the New Haven Trust Company.

After the checks had been delivered, Mr. Chillingworth asked Mr. Potter if he should notify him when the deal went through, and Mr. Potter replied: "No; Mr. Chandler will notify me." There was no agreement or contract entered into between Mr. Chillingworth and either Mr. Potter or Mr. Cavanaugh, or any one else, at this afternoon conference, and there was no agreement or contract between Mr. Chillingworth and either Mr. Potter or Mr. Cavanaugh at any other time, and Mr. Chillingworth at this time intended to deal with, and supposed he was dealing solely with, the officers of the American Quarries Company and with Mr. Taylor as its representative. Mr. Chillingworth immediately returned to New Haven, and on his return deposited the checks referred to in his account as trustee in the Merchants' National Bank of New Haven, where the checks were paid in due course and remain on deposit to the credit of the trustee.

On the day of Mr. Chillingworth's return to New Haven, or the day thereafter, he received a telegram from Mr. Taylor, confirmed by a letter, informing him that $250,000 worth of bonds must be retained, and which also contained the first information received by Mr. Chillingworth of any agreement or arrangement between Mr. Taylor and the petitioners with reference thereto. About a week later, some time about July 10, 1909, Mr. Chillingworth again visited Boston, where he

had a conference at the office of Mr. Chandler and Mr. Taylor, and a draft of an option was prepared by Mr. Chandler conceding to Mr. Taylor the retention of $250,000 worth of bonds. On July 14, 1909, Mr. Chillingworth signed with Mr. Taylor, at Waterbury, Vt., another and amended draft of said option, which was prepared by Mr. Chandler, or under his direction, but which bore date of July 10, 1909, in which there was a provision for the retention of $250,000 worth of bonds by said Taylor.

None of these last-mentioned papers of June 30, 1909, or subsequent thereto, were ever approved by the referee or the creditors' committee of the bankrupt. Mr. Holliday had prior to June 30, 1909, executed a release to Mr. Taylor of whatever interest he had in the option of May 4, 1909, and had also in writing authorized and requested Mr. Chillingworth to place to the credit of Taylor, or his assigns, the $500 given by Mr. Holliday to Mr. Chillingworth on May 1, 1909, to secure the option.

Mr. Chillingworth then proceeded to attempt to secure the consent of the referee and creditors" committee to the retention of $250,000 worth of the bonds which each refused. Mr. Chillingworth immediately notified Mr. Taylor and Mr. Chandler that the referee and creditors' committee had refused their consent; Mr. Chandler taking upon himself to notify Mr. Potter of the refusal of the referee and creditors' committee. On August 12, 1909, after the referee had finally and definitely refused to approve the change, Mr. Chillingworth immediately notified Mr. Chandler that the referee and creditors' committee had refused their consent. No objection or protest ever came to Mr. Chillingworth from either the American Quarries Company or Cavanaugh and Potter against the refusal of the referee to approve the proposed change in the contract, and as a consequence of the refusal of the referee and creditors' committee to consent to the retention by Taylor of $250,000 worth of bonds a final draft of an option was prepared, conceding to Taylor the retention of only $15,000 worth of bonds, and was executed by them on August 17, 1909, and on August 26, 1909, was approved by the referee and creditors' committee. Mr. Taylor had full authority to enter into said option, and it was confirmed and ratified, including all the terms and conditions thereof, by the American Quarries Company and its officers, and Mr. Chillingworth believed and was warranted in believing that Taylor had such authority, and that the American Quarries Company and its officers had approved and ratified, or would approve and ratify, all the provisions thereof.

About two weeks later, Mr. Chillingworth and Mr. Taylor entered into a written agreement extending the time on which the option of August 17 should expire from September 1 to September 11, 1909. This agreement contained the further provision that no title to the Ticonderoga real estate should be conveyed by Mr. Chillingworth. The evidence furthermore justifies the finding that Mr. Taylor and Mr. Chandler well knew of the defect in the title to the Ticonderoga property for some time prior to June 30, 1909, and that Mr. Chillingworth, as trustee, would be unable to convey a clear title thereto, and

as early as September, 1909, both Cavanaugh and Taylor had actual knowledge of such defect.

Early in September, 1909, with the full approval of the American Quarries Company and its officers, Mr. Chillingworth executed, with the approval of the referee, a valid deed of conveyance and bill of sale to the American Quarries Company of all of his title as trustee of the Moretown property in Vermont, including the personal property at Ticonderoga. This conveyance and bill of sale were then delivered to the New Haven Trust Company, pursuant to the terms and conditions of the option contract of June 23, 1909. After this conveyance and bill of sale had been delivered to the American Quarries Company, the latter, by an indenture executed and bearing date of September 8, 1909, conveyed to the Dorchester Trust Company all the real and personal property at Moretown, Vt., excepting and excluding therefrom 5,000 tons of crude mined talc on the dump, or in piles at Moretown, and excepting, further, the product to be mined or quarried at the plant, which indenture was for the security of an issue of bonds of the American Quarries Company to the amount of $1,000,000.

Mr. Chillingworth, before making the conveyance to the American Quarries Company, paid off certain liens and attachments upon the Vermont property, and the American Quarries Company, upon the delivery to it of said conveyance and bill of sale, entered into possession thereof and have ever since remained in possession thereof. It also appears that on July 10, 1909, following the conference in Boston, the American Quarries Company agreed with Cavanaugh and Potter to pay the latter $15,000 on or before August 1, 1910, and also agreed with Cavanaugh and Potter for the shipment and sale of the talc under certain conditions, which included a bill of sale from the American Quarries Company to Cavanaugh and Potter for 5,000 tons of talc at Moretown, and the employment of a man acceptable to Cavanaugh and Potter for conducting the business in Moretown, which bill of sale and conveyance to Cavanaugh and Potter were subsequently executed on September 20, 1909, and which invested them with full power and authority to sell the same and to appropriate the proceeds thereof on account of the sum of $15,000 which Mr. Taylor and the American Quarries Company had agreed should be paid to them. Cavanaugh and Potter had full knowledge of the option contract between Mr. Chillingworth as trustee, and Mr. Taylor, of August 17, 1909, and its subsequent extension and modification on August 31, 1909.

The first demand made by Cavanaugh and Potter, and the first action taken by them, was on June 21, 1912, when they instituted their petition demanding the return to them of $7,500, although there had been two conferences between Potter and Mr. Chillingworth and the latter's attorney, one in January, and another in April, 1910, at neither of which, nor, indeed, at any other time prior to the filing of their petition, did either Cavanaugh or Potter ever demand or request the return to them of the sum of $7,500, or make known to Mr. Chillingworth that they had furnished the same for Mr. Taylor. In fact, Mr. Chillingworth was ignorant of any of the terms or conditions set forth in the petition of Cavanaugh and Potter until it was filed, and at no

time up to the filing of this petition did either Cavanaugh or Potter ever charge Mr. Chillingworth with having violated any condition under which said sum of $7,500 was paid to him, although there was an attempt made by Mr. Potter at a conference between him and Mr. Chillingworth at Worcester early in 1910, to negotiate for the purchase of all of his interest in the assets of the International Mineral Company, excepting and especially excluding said sum of $25,000. The Vermont property is now subject to several attachments in suits against the American Quarries Company by its creditors, and which suits are now pending.

These facts justify the conclusion arrived at by the referee in denying the petitioners' right to a recovery of the $7,500. There are several reasons for this:

[1] I. Mr. Chillingworth took these checks burdened with no trust. He was entirely ignorant of the alleged trust relation until June, 1912, when Cavanaugh and Potter commenced their proceedings against him. Moreover, these checks, with the exception of the one for $360, were certified, the effect of which was, to make them—i. e., the certified checks—the equivalent of so much cash in bank, payable whenever demanded to the holder, discharging the drawer, and making the certifying bank the principal and only debtor. Metropolitan National Bank v. Jones, 137 Ill. 634, 27 N. E. 533, 12 L. R. A. 492, 31 Am. St. Rep. 403; First National Bank v. Currie, 147 Mich. 72, 110 N. W. 499, 9 L. R. A. (N. S.) 698, 118 Am. St. Rep. 537, 11 Ann. Cas. 241; Merchants' Bank v. State Bank, 10 Wall. 604, 648, 19 L. Ed. 1008; St. Regis Paper Co. v. Tonawanda Board & Paper Co., 107 App. Div. 90, 94 N. Y. Supp. 946, affirmed on appeal 186 N. Y. 563, 79 N. E. 1115; First National Bank v. Leach, 52 N. Y. 350, 11 Am. Rep. 708; White v. Eiseman, 134 N. Y. 101, 108, 31 N. E. 276.

The fact that the receipt provided that the checks were to be held in escrow must be regarded as meaningless, for this condition ex vi termini implied delivery to some third person, and not to the grantee, obligee, or payee directly. Raymond v. Smith, 5 Conn. 555, 559. A delivery directly to the grantee, or to the agent or attorney of the grantee, cannot be treated as escrow. Stevenson v. Crapnell, 114 Ill. 19, 28 N. E. 379; Hubbard v. Greeley, 84 Me. 340, 24 Atl. 799, 17 L. R. A. 511; Day v. Lacasse, 85 Me. 242, 27 Atl. 124.

There is no claim of any agreement that the checks should be returned if the terms of the agreement of June 30, 1909, were not carried out; the only result of the failure to secure the approval of the agreement being obviously that the Holliday option of May, 1909, which had been sanctioned by the referee, should stand. Surely, if the payment by Cavanaugh and Potter had been in cash, they could not be heard to ask for its recovery, excepting as they might be entitled to a rescission of the contract. As was said by Wallace, J., in Darling v. Butler (C. C.) 45 Fed. 332, 335, 10 L. R. A. 469:

"When there is a valid delivery of a deed by the grantor to the grantee, it is impossible to annex a condition to such delivery; and the delivery vests the title in the grantee, although it may be contrary to the intention of the parties. 'When the words are contrary to the act, which is the delivery, the words are of none effect.'"

Either the delivery takes effect as absolute, or it is void, and parol evidence of conditional delivery is inadmissible; such evidence being admissible only for the purpose of proving nondelivery. Braman v. Bingham, 26 N. Y. 483. And this rule is extended to and includes any kind of contract. Pickett v. Green, 120 Ind. 584, 588, 22 N. E. 737; Ordinary of New Jersey v. Thatcher, 41 N. J. Law, 403, 32 Am. Rep. 225; State v. Peck, 53 Me. 284. It also includes bills and checks. Massmann v. Holscher, 49 Mo. 87; Jones v. Shaw, 67 Mo. 667; Henshaw v. Dutton, 59 Mo. 139; Badcock v. Steadman, 1 Root (Conn.) 87; Scott v. State Bank, 9 Ark. 36.

[2] II. There was no fraud, either actual or constructive, upon the part of Mr. Chillingworth in transferring these checks to his account as trustee of the bankrupt estate, and in this Mr. Chillingworth did no more than he had a right to do, and indeed was bound to do. Had he not done so, and any loss had developed thereby, creditors of the estate might well have charged him with a breach of his duty. The General Statutes of Connecticut, Revision of 1902, which is declaratory of the common law, provides that:

"A check must be presented for payment within a reasonable time after its issue, or the drawer will be discharged from liability thereon to the extent of the loss caused by the delay." Section 4356.

In fact, the delivery of these checks, especially the ones that were certified, was equivalent to the payment to Mr. Chillingworth of so much cash which he had a right to bank and treat as cash (authorities supra), either under the agreement of June 30, 1909, when ratified, or under the agreement of the preceding May, which manifestly remained in force until the later tentative agreement of June was properly ratified.

[3] III. The vital point of the controversy is that Cavanaugh and Potter have never offered to release their title to the talc and their claims under the numerous agreements entered into between them and the American Quarries Company and Taylor, or to restore to the bankrupt estate the property in the same condition in which it was prior to June 30, 1909. Such an offer was tendered orally by petitioners' counsel at argument, but it was not accompanied by any documents, and, even if it had been, it is apparently impossible for them to do so now, particularly as the Vermont property is subject to various attachments in suits brought by the creditors of the American Quarries Company, which the petitioners do not and manifestly cannot offer to discharge, to say nothing of the trust mortgage to the Dorchester Trust Company. As counsel for the trustee comprehensively say, it is impossible to do equity by rescinding the transaction and making a mutual exchange and return of the consideration received by each party, respectively. A contract cannot be rescinded by one party, unless both parties can be placed in the same situation and stand upon the same terms as existed when the contract was made. Neblett v. MacFarland, 92 U. S. 101, 103, 23 L. Ed. 471. Especially must this be so in the case of a bankrupt estate, where the rights of the creditors are involved.

Moreover, the real party to the actual contract which was made with Mr. Chillingworth was Taylor, and not Cavanaugh and Potter. The

latter merely loaned money to Taylor, who turned it over to Mr. Chillingworth. Cavanaugh and Potter had full knowledge of and were acquainted with all the terms of the transactions and agreements subsequent to June 30, 1909, and as a matter of fact they relied exclusively upon Taylor—for Taylor, Chandler, and the American Quarries Company were all the same person, and that person was Taylor—and it was not until after their failure to receive the bonds which they had contracted for that they made any complaint to Mr. Chillingworth. This delay involved a period of practically three years, during which time Cavanaugh and Potter remained silent, without asserting or attempting to assert their claims, listening to the promises of Chandler and Taylor, and leaving the $7,500 with Mr. Chillingworth, to whom it had been paid by them, in the constant hope that affairs would so develop that eventually they would get out all right. The law is well settled that the party seeking to rescind must announce his purpose to do so promptly, unconditionally, and unevasively upon the discovery of the fraud. Grymes v. Sanders, 93 U. S. 55, 62, 23 L. Ed. 798; Shappirio v. Goldberg, 192 U. S. 232, 24 Sup. Ct. 259, 48 L. Ed. 419.

It is immaterial whether this be called laches or equitable estoppel. Laches consists in inexcusable delay in asserting a right. Byrne v. Schuyler Electric Manufacturing Co., 65 Conn. 336, 31 Atl. 833, 28 L. R. A. 304. It involves negligence, and arises from a failure in duty, without which there can be no laches. It is inexcusable negligence and inattention to one's interests. Smith v. Duncan, 16 N. J. Eq. 240; Allis v. Hall, 76 Conn. 322, 334, 56 Atl. 637. Equitable estoppel involves conduct inducing another to believe and act to his prejudice. Allis v. Hall, supra, 76 Conn. 334, 56 Atl. 637. And whatever may be the proper nomenclature the result in this case is the same, for it manifestly falls within the well-settled principle that, where a court of equity finds that the position of the parties has so changed that equitable relief cannot be afforded without doing injustice, it will not assert its equitable powers in order to save one from the consequences of his own neglect. This rule is enforced independently of any statute of limitations for the reason, stated by Lord Camden, that:

"That nothing can call forth this [Chancery] Court into activity but conscience, good faith, and reasonable diligence; where these are wanting the court is passive and does nothing." Smith v. Clay, 3 Bro. Ch. 640, note.

This doctrine has been repeatedly recognized and acted upon. In Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718, it was held that a bill in equity against persons holding a fund in trust for the benefit of a voluntary association living together as a community and subject to its regulations could not, whether the trust was lawful or unlawful, be maintained by one who had left the community and had for a considerable period taken no steps to claim an interest in the fund. In Galliher v. Cadwell, 145 U. S. 368, 372, 12 Sup. Ct. 873, 874 (36 L. Ed. 738) the Supreme Court, speaking of this defense, said:

"The cases are many in which this defense has been invoked and considered. It is true that by reason of their differences of fact no one case becomes an exact precedent for another, yet a uniform principal pervades

them all. They proceed on the assumption that the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless, or have been abandoned; and that, because of the change in condition or relations during this period of delay, it would be an injustice to the latter to permit him to now assert them."

The same ruling was made in Penn. Mutual Life Insurance Co. v. Austin, 168 U. S. 685, 18 Sup. Ct. 223, 42 L. Ed. 626, where, in an exhaustive opinion delivered by Mr. Justice White, the authorities were reviewed at great length. So, too, in Ward v. Sherman, 192 U. S. 168, 24 Sup. Ct. 227, 48 L. Ed. 391, an action in equity to obtain the rescission of a contract, where it was held (page 175), citing Pollock's Principles of Contracts, page 515, that a contract must be rescinded within a reasonable time; that is, before the lapse of a time after the true state of things is known so long that, under the circumstances of the particular case, the other party may fairly infer that the right of rescission is waived. In the opinion of the court, delivered by Mr. Justice Brewer, the court restated its position in Penn. Mutual Life Insurance Co. v. Austin, supra, 168 U. S. 685, 18 Sup. Ct. 223, 42 L. Ed. 626, that where a court of equity finds that the position of the parties has so changed that equitable relief cannot be afforded without doing injustice, it will not assert its equitable powers in order to save one from the consequence of his own neglect.

Other cases directly in point are Harwood v. Railroad Co., 17 Wall. 78, 21 L. Ed. 558; Twin Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328; Brown v. County of Buena Vista, 95 U. S. 157, 24 L. Ed. 422; Hayward v. National Bank, 96 U. S. 611, 24 L. Ed. 855; Holgate v. Eaton, 116 U. S. 33, 6 Sup. Ct. 224, 29 L. Ed. 538; Davison v. Davis, 125 U. S. 90, 8 Sup. Ct. 825, 31 L. Ed. 635; Société Fonciere v. Milliken, 135 U. S. 304, 10 Sup. Ct. 823, 34 L. Ed. 208. Indeed, the principle upon which a court of equity declines to assert its powers to relieve one who has been guilty of neglect or delay has been applied to such an extent as to render the doctrine elementary. Penn. Mutual Life Insurance Co. v. Austin, supra, 168 U. S. 697, 18 Sup. Ct. 223, 42 L. Ed. 626.

[4] IV. The petitioners' contention that this defense must be pleaded by an answer or raised by a demurrer is not well taken. In Willard v. Wood, 164 U. S. 502, 524, 17 Sup. Ct. 176, 181 (41 L. Ed. 531), the Supreme Court said:

"But the recognized doctrine of courts of equity to withhold relief from those who have delayed the assertion of their claims for an unreasonable length of time may be applied in the discretion of the court, even though the laches are not pleaded or the bill demurred to. Sullivan v. Portland & Kennebec Railroad, 94 U. S. 806, 811 [24 L. Ed. 324]; Lansdale v. Smith, 106 U. S. 391, 394 [1 Sup. Ct. 350, 27 L. Ed. 219]; Badger v. Badger, 2 Wall. 87, 95 [17 L. Ed. 836]."

The same rule applies where the defense is an estoppel in pais. Such a defense need not be pleaded. Plumb v. Curtis, 66 Conn. 154, 33 Atl. 998; Hawley v. Middlebrook, 28 Conn. 527, 536. Bigelow on

Estoppel (6th Ed.) 763, states this to be the rule and supports it with numerous citations.

The order of the referee should be affirmed. Let an order to that effect be entered.