# WARD v. SHERMAN.

## APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF ARIZONA.

No. 25. Argued October 15, 16, 1903.—Decided January 11, 1904.

Where the holder of a defaulted mortgage on a cattle range and cattle accepts the property in payment of the debt in pursuance of a written contract and enters into possession, treating the property as his own for all purposes, the former owner cannot, in the absence of fraud or mistake, after three and a half years obtain a rescission of the contract and treat the vendee as merely a mortgagee in possession. The doctrine of laches applies.

The fact that the vendor failed to deliver part of the property and the vendee commenced an action for the value thereof, alleging such value as the unpaid balance of the original debt, does not amount to a repudiation on his part of the contract of sale, the affidavit accompanying the complaint stating that the debt sued for was not secured by mortgage or otherwise.

Where an action is not brought in proper form but the plaintiff's intention is manifest equity will not destroy rights on account of a mere technical mistake of counsel.

THE facts in this case are few and beyond dispute, most of them being shown by the averments in the answer of the defendant Sherman. On August 23, 1889, Ward, the plaintiff and appellant, sold to the defendants the Sunflower range, together with the cattle thereon and other personal property. A conveyance was by agreement made to the defendant Hardenberg, who, to secure a part of the purchase price, to wit, $25,000, evidenced by two notes of $12,500 each, made by Hardenberg and guaranteed by Sherman, executed a mortgage of the cattle and some other property. Thereafter the defendants incorporated themselves under the laws of the Territory of Arizona as the Sherman-Hardenberg Cattle Company, and transferred to it all of the property above mentioned,

subject to the payment of the two notes held by the plaintiff. On September 12, 1894, an agreement was entered into between the company and the plaintiff which, after reciting the indebtedness, reads as follows:

"Whereas, the said party of the second part is unable to pay to said party of the first part the said sum of $14,500 due on October 1, 1894, and has notified said party of the first part that it will be unable to pay said sum at said time; and

"Whereas, said party of the second part desires to deliver up and turn over to said party of the first part all of the property heretofore purchased by one David Hardenberg of the party of the first part, and for which said notes were given as a part of the purchase money:

"Now, therefore, in consideration of the promises and agreements of said party of the first part, the said party of the second part hereby agrees to and with said party of the first part to transfer and convey by proper deeds of conveyance and bills of sale all of the real and personal property heretofore purchased by the said David Hardenberg of the said party of the first part; also, all personal and real property owned by the said party of the second part in the Territory of Arizona, in whomsoever's name the same may now stand, to said party of the first part, and more particularly described as follows, to wit: The Sunflower Cattle Range in Maricopa County, Arizona Territory; all cattle, horses, mules or burros branded with either of the following brands: Diamond brand, thus: ◇; H. B. brand, thus: HB; also all wagons, mowing machines, farming implements and camp outfit, and everything pertaining to or used by said Sherman-Hardenberg Cattle Company, excepting only from the provision of said conveyance such cattle as shall have been sold and delivered by said Sherman-Hardenberg Cattle Company prior or to September 1, 1894, it being understood that all stock cattle which may have been sold subsequent to September 1, 1894, shall be accounted for by the party of the second part to said party of the first part.

"That in consideration of the said party of the second part

conveying to said party of the first part all of the property hereinbefore described within thirty days from the date hereof, and delivering possession of the same to said party of the first part or his authorized agent, in said county of Maricopa aforesaid, the said party of the first part hereby covenants and agrees to deliver to said David Hardenberg and one M. H. Sherman two promissory notes, each for $12,500, one of which matures on October 1, 1894, and one of which matures on October 1, 1897, heretofore executed by the said Hardenberg and Sherman to the party of the first part; also to release the said Hardenberg and Sherman from the payment of all interest due thereon, and to cancel and discharge a certain chattel mortgage executed by the said David Hardenberg to the said party of the first part, for the purpose of securing the payment of said notes, which said mortgage is now on file and of record in the office of the county recorder of Maricopa County, in the Territory of Arizona.

"In witness whereof, the said party of the second part, The Sherman, Hardenberg Cattle Company, has executed these presents in its corporate name, by its president, and the said party of the first part has executed these presents the day and year first above written."

The following instrument was also executed:

"PHOENIX, ARIZONA, *Sept.* 29, 1894.
"To J. M. WARD, ESQ.:

"The Sherman-Hardenberg Cattle Company hereby authorizes you to enter upon and take possession of all the property belonging to the Sherman-Hardenberg Cattle Company, in accordance with and as described in that certain contract entered into by and between the Sherman-Hardenberg Cattle Company and yourself, bearing date on the 12th day of September, A. D. 1894.

"That on receipt of said property you are to turn over to the Sherman-Hardenberg Cattle Company, at the office of C. F. Ainsworth in Phoenix, Arizona, the notes described in the

contract, and also to cancel the chattel mortgage held by you on the property therein referred to.

> "THE SHERMAN–HARDENBERG CATTLE CO.,
>> "By C. F. AINSWORTH, *Its Secretary.*

"I hereby authorize H. C. Ward as my agent to rec. the above described property for me.

>> "J. M. WARD."

All the property mentioned in this agreement was turned over to Ward except, as he claimed, 104 head of cattle. Ward retained possession of the property and managed it as his own, but did not cancel the mortgage or surrender the notes, insisting that he was entitled to receive the 104 head of cattle or else their value.

On June 12, 1895, he commenced an action in the District Court for the county of Maricopa, in which he set forth a copy of the first of the notes, and alleged that there was due thereon the sum of $1500. At the same time he filed an affidavit for an attachment, in which he averred that the payment of the note was not secured by mortgage or lien upon any real or personal property, or any pledge of personal property, and that the amount due was $1500. No property was attached and no service of process made until May 6, 1899, and then only on the defendant Sherman, who thereupon filed an answer and counterclaim, which was in the nature of a cross-bill in equity, in which he set up the purchase from Ward, the organization of the company, the transfer to the company of the property purchased and the agreement for the delivery of the property to Ward and the return of the notes and cancellation of the mortgage, and alleged that though the property had been delivered the notes had not been returned nor the mortgage cancelled. He also alleged a transfer by the company to himself of all its rights and claims.

The trial court found the facts as above stated in respect to the original transactions between Ward and defendants, the organization of the company, the transfer to it and by

it to Sherman ; and, further, in reference to the transaction between the company and Ward in 1894 it found as follows:

"5. That during the month of September, 1894, and before the maturity of the first note, the Sherman-Hardenberg Cattle Company attempted to make a settlement with the plaintiff, by agreeing to turn over to him the Sunflower range, all the cattle then on the range, also the desert wells, and other property which it had, which was not included in the mortgage, on condition that said plaintiff turn over and deliver up the two notes aforesaid, with the interest thereon, and cancel and satisfy the mortgage securing the same.

"6. That this contract was never carried out on the part of the plaintiff; but that acting under it he took possession of all the property of the Sherman-Hardenberg Cattle Company, as aforesaid, on or about October 1, 1894; but never turned over, delivered or cancelled said notes, or either of them; or satisfied or discharged the chattel mortgage securing the same. And that, on the contrary, he brought suit on one of said notes for the collection of a portion that he claimed to be due thereon. At the time he brought this suit on the note maturing October 1, 1894, the other note had not matured."

It thereupon adjudged that Ward was a mortgagee in possession, and after finding the disposition which he had made of the property entered a judgment in favor of the defendant Sherman for $17,173.50, and decreed the cancellation of the notes and mortgage.

By section 1 of an act of the territorial assembly, Laws Arizona, 1897, p. 127, it is provided that in a case appealed to the Supreme Court of the Territory the appellant may have the testimony taken in the trial transcribed and certified by the court reporter, and filed with the papers in the case, and that thereupon it shall "become and be a part of the record in said cause;" and be transmitted to the Supreme Court of the Territory with the other papers in the case. That was done in this case, and part of the record-taken to the Supreme Court

of the Territory and brought here is the duly certified transscript of the testimony taken on the trial.

Section 2 of that act also provides that it shall not be necessary "to file with the Supreme Court any transcript, assignment of errors or other papers except as herein provided." Section 3 requires the plaintiff in error, or appellant, to make an abstract of the record for the benefit of the opposite party and the Supreme Court. Sections 4 and 5 are as follows:.

"SEC. 4. Each party shall prepare and print or typewrite an argument of the points and authorities relied on. The briefs of both sides shall begin with a succinct statement of so much of the record as is essential to the questions discussed in them, referring to the printed abstract by folios and sufficient to dispense with the reading of the printed abstract on the argument. The brief of the plaintiff in error or appellant shall also next contain a distinct enumeration in the form of propositions of the several errors relied on, and all errors not assigned in the printed brief shall be deemed to have been waived. It shall not be necessary to assign or file any assignment of errors in the court below or Supreme Court, except those assigned in the brief of the plaintiff in error or appellant.

"SEC. 5. All rulings made by the court below in opposition to the plaintiff in error or appellant shall be taken as excepted to by the party appealing or suing out the writ of error, and when assigned as error in the brief shall be reviewed by the Supreme Court without any bill of exceptions or other assignment of errors as herein provided."

The record discloses that in the Supreme Court the appellee moved to strike from the files appellant's abstract of record. No action appears to have been taken upon this motion. The record also discloses that leave was given to the appellant to file a supplemental brief. Neither the original nor the supplemental brief, if one was filed, is before us.

*Mr. A. B. Browne* and *Mr. A. A. Hoehling, Jr.,* with whom *Mr. C. S. Wilson* was on the brief, for appellant.

*Mr. C. F. Ainsworth* for appellee.

Mr. Justice Brewer, after making the foregoing statement, delivered the opinion of the court.

The Supreme Court of the Territory, without considering the merits of the case, affirmed the judgment on the ground that the assignment of errors was insufficient, citing in its opinion from a rule of practice which had been prescribed by it and in force for many years: "All assignments of errors must distinctly specify each ground of error relied upon, and the particular ruling complained of. . . . An objection to the ruling or action of the court below will be deemed waived here, unless it has been assigned as error, in the manner above provided." Undoubtedly the assignment of errors was general in its terms. An application was made to the Supreme Court for leave to amend the assignment of errors, but it was denied. In a short *per curiam* opinion that court, after condemning the assignments as insufficient, said:

"The rules relating to assignments and specifications of error have been so long in force, and we have so often decided that a failure to make proper assignments amounts to a waiver of all errors which are not fundamental, that it would seem there should be no longer occasion for disregard of these plain requirements. In the absence of any assignment of error in this case, and none appearing upon the face of the record, the judgment must be affirmed."

We shall not stop to inquire whether the court erred in refusing to permit an amendment of the assignment of errors, but accepting its conclusion that the failure to make proper assignments is "a waiver of all errors which are not fundamental," and bearing in mind the provisions of section 5 of the statute of 1897, that all rulings made by the court below in opposition to the plaintiff or appellant are to be taken as excepted to, we proceed to inquire whether there was not a fundamental error which should have been corrected by the

Supreme Court. We are of opinion that there was. It may be assumed, as no objection was made on that account, that the counterclaim, which was in its nature a bill in equity for the redemption of the mortgaged property, was properly filed in this action to recover money. Can such a bill be sustained under the circumstances disclosed by the answer? It appears from that answer that the property was turned over to Ward to hold, not as mortgagee, but under a contract by which he was to take the property in satisfaction of the debt, cancel the mortgage and return the notes. In other words, according to the averments of the answer a contract of sale was made by the company to Ward, and under the contract of sale Ward took possession. Now, even if it be conceded that Ward's failure to perform was such a breach of the contract as entitled the company to rescind and thereafter to treat Ward as a mortgagee in possession, a bill in equity to enforce such a decision must be presented within a reasonable time. The right to rescind is an affirmative right, asserted by the vendor, the former mortgagor, and, being such, it must be asserted by him within a reasonable time. The answer alleges that on or about October 1, 1895, this agreement was made and the property delivered, but it was not filed until May 16, 1899, more than three years and a half thereafter. During all that time, Ward was in possession of the property, managing and dealing with it as his own. Can it be that a vendor can wait three years and a half, permit the vendee to deal with the property as his own—that property being of a value variable from year to year and requiring constant care to make it prosperous—give his time and labor to its management, take the chances of rise or fall in the market, and then, if it turns out that the business has been prosperous through his efforts, insist on account of some technical failure upon a rescission of the contract, and that the party who has been supposing himself the owner, and acting as such, shall be treated as a mortgagee in possession, and held to account for the success of his business efforts? In Pollock's Principles of Contracts, p. 515, the author says:

-"The contract must be rescinded within a reasonable time, that is, before the lapse of a time after the true state of things is known, so long that under the circumstances of the particular case the other party may fairly infer that the right of rescission is waived."

See also *Grymes* v. *Sanders*, 93 U. S. 55; *McLean* v. *Clapp*, 141 U. S. 429, 432.

But was there any ground for the rescission of the contract? There was no fraud, mistake or false representations. There is no suggestion that the contract was not entered into with full knowledge or that it was unfair in any of its details. The complaint merely is that Ward was guilty of a breach of one of its stipulations. If so, the company was entitled to damages for that breach, but no damages are shown. The company paid nothing; has lost nothing. So far as disclosed it went out of business, and therefore the failure to release the mortgage could not have injured its business credit. But whatever may be the rights, other than a simple claim of damages for breach of contract, possessed by the company and transferred by it to the defendant Sherman, they are equitable in their nature, and in respect to them the general doctrine of laches applies. We have often had occasion to consider the question of laches. In *Galliher* v. *Cadwell*, 145 U. S. 368, 373, and *Penn Mutual Life Insurance Company* v. *Austin*, 168 U. S. 685, are collected the decisions of the court. In the former of these cases it is said, p. 372.

"They (the adjudicated cases) proceed on the assumption that the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum; that by reason of his delay the adverse party has good reason to believe that the alleged rights are worthless, or have been abandoned; and that, because of the change in condition or relations during this period of delay, it would be an injustice to the latter to permit him to now assert them." And again, p. 373:

"But it is unnecessary to multiply cases. They all proceed

upon the theory that laches is not, like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties."

And in the last case, p. 698:

"The reason upon which the rule is based is not alone the lapse of time during which the neglect to enforce the right has existed, but the changes of condition which may have arisen during the period in which there has been neglect. In other words, where a court of equity finds that the position of the parties has so changed that equitable relief cannot be afforded without doing injustice, or that the intervening rights of third persons may be destroyed or seriously impaired, it will not exert its equitable powers in order to save one from the consequences of his own neglect."

Apply these considerations to the case at bar. The property was turned over on a contract of sale. Ward was left in possession for over three years and a half without a suggestion of any claim that he was only a mortgagee in possession. He had a right to believe that he was the owner. If the contract had not been made he could have foreclosed his mortgage and acquired title by sale under foreclosure proceedings. He dealt with the property as his own. He gave his time, skill and labor to the work of caring for it. It is impossible to replace the parties in the situation they were in at the time the contract was made. It would be grossly inequitable to deprive him of the benefit of his time, skill and labor, and give it to the mortgagor, who all those years did nothing and gave no notice of any question of the completeness of Ward's title. It seems to us that the doctrine of laches applies with force, and that upon the pleadings the court should have adjudged the defendant not entitled either to a rescission of the contract or to hold the vendee as a mortgagee in possession.

If we look beyond the pleadings to the testimony (and that, as we have seen, was by virtue of the statute made a part of the

record of the case in the Supreme Court) the error of the trial court is even more apparent.

The agreement of September 12 provided for the transfer and conveyance of all cattle on the Sunflower range, branded with the named brands, "excepting only from the provision of said conveyance such cattle as shall have been sold and delivered by said Sherman-Hardenberg Cattle Company prior or to September 1, 1894, it being understood that all stock cattle which may have been sold subsequent to September 1, 1894, shall be accounted for by the party of the second part to said party of the first part." By this all the cattle belonging to the company on September 1 were to be transferred to the plaintiff, and if any of such cattle had been sold subsequently to September 1 they were to be accounted for by the company to the plaintiff. Further, the agreement stipulated for the delivery and cancellation of the notes and mortgage "in consideration of the said party of the second part conveying to said party of the first part all of the property hereinbefore described within thirty days from the date hereof, and delivering possession of the same to said party of the first part or his authorized agent, in said county of Maricopa aforesaid." By the undisputed testimony two lots of cattle, one of 69 or 70 head and the other of 34 or 35 head, were sold and delivered by the company to other parties than the plaintiff after the first of September. Therefore the company was to account for those cattle so sold and delivered, and the duty resting upon Ward to surrender and cancel the notes and mortgage was conditioned upon the delivery within the county of the property described within thirty days from September 12. In short, the terms of the contract were clear. Ward performed all that he was under obligations to perform. The default was on the part of the company. Ward took possession of the property delivered, managed it successfully for several years, and still the court held that the defaulting party could take advantage of its own default, appropriate the entire profits of Ward's care and ability, and upon that basis adjudged against Ward the

return of all the property then in his possession and the payment of over seventeen thousand dollars.    But it is said that Ward himself repudiated the agreement because he brought suit on the first of the notes.    There may have been a technical mistake in the form of the action, but there was no repudiation of the agreement, as is shown by the fact that the complaint only asked judgment for $1500, and that Ward filed with the complaint an affidavit for an attachment, in which he averred that the payment of the sum due was "not secured by any mortgage or lien upon real or personal property or any pledge of personal property."    But equity will not destroy rights on account of a mere technical mistake of counsel.    It may be conceded that Ward should have brought an action in form for the value of the cattle not delivered, but it is manifest that that value was all that he was seeking to recover.

*The judgment of the Supreme Court of Arizona is reversed and the case remanded to that court with instructions to reverse the judgment of the District Court and remand the case to that court for further proceedings in conformity to the views herein expressed.*