## STEAUA ROMANA SOCIETATE ANONIMA PENTRU INDUSTRIA PETROLEULUI OF BUCHAREST v. WOODMAN.

### No. 3971.

District Court, E. D. Pennsylvania.
July 23, 1931.

Albert Smith Faught and T. Henry Walnut, both of Philadelphia, Pa., for plaintiff.

William J. Conlen and William Clarke Mason, both of Philadelphia, Pa., for defendant.

KIRKPATRICK, District Judge.

The plaintiff in this suit in equity is a corporation organized under the laws of Rumania and will be referred to as the "Rumanian Corporation." The defendant is an American citizen. The prayers of the bill are that the defendant be decreed to be a trustee for the plaintiff's benefit of substantially all the capital stock of Union Petroleum Steamship Company, an American corporation organized under the laws of Delaware, which will be referred to as the "Delaware Corporation," and for an accounting of dividends and profits received by the defendant by virtue of the stock.

The foundation of the plaintiff's case is an alleged oral agreement of trust made in connection with the transfer of the steamship Steaua Romana by the plaintiff to the Delaware Corporation for the purpose of obtaining American registry for the vessel for the period of the World War.

### Findings of Fact.

1. At the outbreak of the war, the tank steamer Steaua Romana was lying in the port of Bremen. She was owned by the Rumanian Corporation, having been purchased by it about a year before for approximately $420,000 from a German corporation. She had been registered under the laws of Rumania and was entitled to fly the flag of Rumania, a then neutral country. Without going into the various corporate entities involved, it may be taken as a fact that the stock of the Rumanian Corporation was entirely German owned and that it was under the indirect, but complete, control of the Deutsche Bank of Berlin.

2. The precise status of the vessel as a neutral will be the subject of discussion hereafter. Suffice to say that the German interests considered it advisable, before letting her sail, to arrange for her transfer to American registry. Acting for them in Germany throughout was Emil Georg von Stauss, a German citizen and a managing director of both the Deutsche Bank and the Rumanian Corporation. The Deutsche Bank, through indirect stock ownership, also controlled various corporations in the United States, among them, Union Petroleum Company, with offices in Philadelphia, of which Woodman, the defendant, was vice president and treasurer. Von Stauss first planned to have the vessel sold to Union Petroleum Company, subject to a condition reserving to the Rumanian Corporation the right to repurchase her at the same price at the end of the war.

3. This proposal was communicated to Union Petroleum Company in two sections. An absolute offer to sell was cabled direct, and a "request" to accept under an obligation to resell (which in view of the relations of the companies probably amounted to an instruction) was transmitted via an agent in Denmark. The purpose was to prevent the discovery by the British of the real transaction. The president of the company replied through the agent in Denmark that the resale condition was impossible, and at approximately the same time there was transmitted direct to the Rumanian Corporation a complete acceptance of the other, or unconditional, part of the proposition.

█ Comment: It is perfectly apparent from the relations of the parties and their subsequent conduct that Union Petroleum Company intended by this communication merely to express its willingness to take title to the ship under the form of an absolute sale to it, and to outline a method to be followed. Union Petroleum Company has at no time taken the position or even suggested that by virtue of the foregoing interchange it became entitled to insist on title being transferred to it, although with the full knowledge of its officers other arrangements were later made. By the law of contracts a conditional offer cannot become a contract by an acceptance which expressly repudiates the condition, and consequently no contract came into being. These observations answer the defendant's contention that the Rumanian Corporation had contracted for and was bound to an absolute sale, and that Von Stauss had no right or authority to require any further condition for its benefit or otherwise.

4. The foregoing interchange of messages constituted what may be called the first stage of the negotiations ending in the latter part of September, 1914. The original idea of a sale to Union Petroleum Company with a condition of repurchase after the war was then abandoned by Von Stauss and of course the American Corporation, controlled by the Deutsche Bank, dropped it as well.

5. The next stage began with the suggestion from one Adams, a New York representative of the Deutsche Bank, that Woodman go to Berlin to meet Von Stauss. Von Stauss agreed and Woodman arrived in Berlin October 14, 1914. The Delaware Corporation (Union Petroleum Steamship Company) was then in existence. It had been organized some time before for the purpose of taking title to the vessel, and had been nominated for that purpose by Union Petroleum Company in its

telegram outlining the method to be followed upon a transfer. Apparently none of its stock, other than the incorporators' shares, had as yet been issued.

6. After a number of interviews in Berlin, Von Stauss and Woodman agreed that the vessel should be conveyed to the Delaware Corporation, that the stock of the Delaware Corporation should be issued to Woodman, and that Woodman would take and hold the same in trust for the benefit of the Rumanian Corporation for the period of the war. Woodman was to get $2,000 of the stock and 10 per cent. of the surplus, over 6 per cent., of the profits arising out of the vessel's operations, as compensation for his services. The Deutsche Bank was to finance the transaction, the arrangement being that the bank, through Adams, would advance $598,000 to Woodman against his (Woodman's) receipt and the stock of the Delaware Corporation as collateral, that Woodman would turn the money over to the Delaware Corporation (presumably in payment for his stock), which company in turn would pay it to the Rumanian Corporation as the price of the ship. This agreement was entirely oral, but was complete, definite, and explicit. It was intended that the vessel should engage in carrying cotton from the United States to Germany.

Comment: I have thus accepted without reservation the testimony of Von Stauss appearing in his answers to the interrogatories, as to what occurred in Berlin, and I have found as a fact that the defendant's agreement of trust as to the stock of the Delaware Corporation was made substantially as, alleged in paragraphs 8 and 9 of the plaintiff's amended bill of complaint as amended. Dr. Lehner, one of the managers of the Rumanian Corporation, who assisted Von Stauss with the transaction, but who did not discuss it in detail with Woodman, corroborated Von Stauss to the extent that he remembered a statement by Woodman that $2,000 worth of the stock of the company was "for himself." Von Gwinner, chairman of the board of the Rumanian Corporation, and a managing director of the Deutsche Bank, also corroborated Von Stauss at several points. If nothing beyond a sale of the ship had been contemplated, it would be difficult to suggest a sensible reason for Woodman's trip to Berlin. But above all, it is of the highest significance that Woodman who was in Philadelphia during the hearing of the cause at no time offered himself as a witness to contradict any of Von Stauss' statements. Of course his sworn answer is in the case, but his failure to submit to cross examination is not to be overlooked.

7. During Woodman's stay in Germany, title to the vessel was transferred and provisional registry under the American flag obtained for her, the original intention, however, being not to let her sail until after the financial part of the transaction had been completed in New York. A bill of sale, bearing date October 31, 1914, was duly executed by Dr. Lehner and Dr. Kirschen, two representatives of the Rumanian Corporation duly constituted by it, in accordance with its by-laws, its agents in this behalf, by which the Rumanian Corporation unconditionally sold the vessel to the Delaware Corporation for $600,000.

8. Provisional registers for ships tied up in foreign ports by the war and coming under the requirements of the law as to American ownership had been provided for by the Commissioner of Navigation, and American consuls were authorized to issue such registers upon production to them of the bill of sale and an affidavit executed by the vendee and signed by the vendor or his authorized agent, containing among other things the statement: "2. There is no agreement or understanding reserving to the vendor, or for his benefit, any interest in the vessel, or its operation, or right or voice of control therein." An affidavit in the required form was signed and sworn to by Woodman and signed by Lehner and Kirschen, which, with the bill of sale, was produced by Woodman to the American consul at Bremen in obtaining the provisional American registry.

9. When Woodman left Berlin for the United States, he took with him a letter from Von Stauss to Adams, the contents of which he was familiar with. This letter, dated November 14, 1914, advised Adams that it was satisfactory to Von Stauss that the stock of the Delaware Corporation should remain registered in the name of Woodman, "for the time being." It also informed Adams as to the "remuneration for Mr. Woodman in connection with his services." This letter was apparently taken from Woodman by the British authorities when he was in London on his way home, and by them mailed to Adams who received it.

Comment: The interception of the letter serves to accentuate the obvious desirability from the standpoint of the Germans of committing as little as possible of their plans to writing. In ordinary times the very fact that

so important a part of the transaction was entirely by word of mouth might raise a doubt that it ever occurred at all. Under the circumstances of this case no such suspicion arises. The letter itself cannot be reconciled with any reasonable theory other than that of a trust in the stock, and, again, Woodman has not taken the stand to deny that he carried the letter and knew its contents.

10. With Woodman's arrival in New York the transaction entered upon its third stage. For the German owners its execution had been committed principally to Hugo Schmidt, a representative of the Deutsche Bank in New York. In carrying out the plan, Schmidt, on his own authority, changed some details of the financing. This change, which will be considered, was not of vital importance and neither it nor anything done by the parties in New York abrogated or impaired in any way the trust agreement made in Berlin between Von Stauss and Woodman, which remained in full force and effect at all times referred to herein.

Comment: I am unable to find from Schmidt's testimony or his letters any real support for the interpretation placed by the defendant upon what happened in New York —an alternative theory, based upon the assumption that the trust arrangement which I have found to have been entered into, or a similar one did actually exist. The theory is that Schmidt, scared by the advice of Woodman's lawyer or by his own information to the effect that the British Prize Courts were likely, in the event of seizure of the vessel, to disregard the flag and its immediate corporate ownership and to condemn it if the remote German interest should be disclosed, took it upon himself completely to alter the original arrangement, scrapped the entire trust agreement, and turned the transaction into an absolute sale to Woodman at the agreed price, with no reservation whatever of any beneficial interest in the stock of the owning corporation, thus wiping out entirely the reversionary interests of his principals. Again, I am compelled to note that Woodman did not offer to testify that such a change was made, though he was an active participant, with his counsel, in all the conferences in New York at which the method of financing was settled. A consideration of the financing as actually carried out, however, will go a long way toward resolving the issue raised by this contention of the defendant.

11. On January 2, 1915, the Deutsche Bank, at Von Stauss' request, had cabled Schmidt, "You may finance Edward Youngstown" (a code word for the steamship Steaua Romana and also for Union Petroleum. Company). This cable was supplemented by another on January 11th, partly as follows: " ᴸ * * ownership to be settled according letter Edward Dean to Emil George, 15th December as to rest please act according Woodman's suggestions if they appear reasonable." The letter, "Edward Dean to Emil George," referred to, was a letter written by Adams to Von Stauss in reply to the letter of November 14, 1914, which had been taken from Woodman in London, and mailed to Adams by the British authorities. It noted the arrangement respecting the shares of the steamship company and the remuneration for Mr. Woodman and went on: "The final disposition of the shares will, of course, receive your consideration, and if the same are registered in Mr. Woodman's name, their proper endorsement in Bank (blank) with witness, to protect the interests of the owners."

12. In the meantime, however, on the night of January 5th, Schmidt had had a conference with Woodman and his attorney and had definitely agreed upon a different method of financing, in pursuance of which the following steps had been taken: Woodman took the capital stock of the Delaware Corporation to the Guaranty Trust Company of New York, upon which as collateral for his own notes, he borrowed the sum of $598,000. This money was immediately deposited with the Guaranty Trust Company to the account of the Rumanian Corporation; but, and this was a vital element in the deal, the Deutsche Bank, through Schmidt, guaranteed to the Guaranty Trust Company that the money deposited to the account of the Rumanian Corporation on the time deposit would not be withdrawn until Woodman's notes had been paid.

Comment: The stock of the corporation was obviously collateral of extremely doubtful security since the ship might be seized or sunk and the question of insurance in such cases was always a risky one. There is nothing to show definitely whether or not Woodman's personal notes were worth anything, but the indications are that they were not worth much. The real security for the loan was, of course, the guaranty of the Deutsche Bank that the deposit of the Rumanian Corporation would remain with the Guaranty Trust Company until Woodman's notes were paid. Thus, if the various intervening corporations and persons be disregarded, the transaction was a purchase by the Deutsche Bank of its own ship with money obtained

upon the credit of its own guaranty. By the use of Woodman's name the ship was released for operations in trade which were bound to prove profitable if she survived.

This procedure changed the plan adopted in Berlin in the following particular: Instead of the Deutsche Bank, through Adams, loaning the money to Woodman and taking the stock from him as collateral, the money was advanced by the Guaranty Trust Company, ostensibly on the stock. The real security for the loan given by the Deutsche Bank (the guaranty as to the Rumanian Corporation's deposit) appeared in an entirely separate transaction between entirely different parties. As Schmidt pointed out in his letter of January 6, 1915, "Both operations will be kept strictly apart and will be attended to by different departments of the Bank (Guaranty Trust Company) which have no knowledge of each other's transactions." Thus the Deutsche Bank's participation was removed still further from the vendee in the transfer. The risk of its discovery was lessened but the Germans gave up their hold on the stock of the Delaware Corporation and were taking a longer chance on Woodman's honesty.

Schmidt's request to Von Stauss for a cable approving the steps taken by him by no means compels the conclusion that he had on his own responsibility abrogated the trust agreement and made an absolute sale. He had, as a matter of fact, changed the method of financing in a manner, not necessarily vital but still of some importance, and was too careful to permit the ship to sail without having his entire course approved and ratified.

No one questions that the transaction from beginning to end appears on paper as a perfectly clear-cut sale absolute in character. The whole purpose of all hands engaged was to make it appear as such; and it seems hardly necessary to observe that the fact that they succeeded furnishes no proof either for or against the existence of the scheme, and is just as compatible with the plaintiff's position as with the defendant's.

The defendant's contention is based mainly upon a rather plausible but wholly incorrect interpretation of certain of Schmidt's letters to his principals in Berlin. In the first place it must be remembered that these letters were all written with an eye to the possibility that they would be read by the British authorities. It was supposed that Woodman's mail had already been opened when he was in London and there was a thought in their minds that Woodman himself had been listed by the British as a spy. Even confidential correspondence between the German interests and their agents was necessarily equivocal and lacking in explicit language. Consequently, passages such as that in the letter of January 30, 1915, which refers to "unjustified rumors" that "German capital, i. e., the Deutsche Bank, was said to be interested in the vessel, * * * " may be largely discounted. Secondly, the defendant is clearly in error as to the subject matter of the letter of January 30th. What Schmidt is talking about is a second change in plans, namely the abandonment of the idea of using the vessel in the cotton trade with Germany. Compare Woodman's letter to Von Stauss of March 8, 1915, on the same point, also referring to The Dacia Case. The financing had all been accomplished and the transfer completed weeks before January 30th. The letter is poorly translated and the English version of the second paragraph is especially misleading. There is nothing about the *method* in it. What the paragraph says is: "However, in the meantime, the affair has taken on an entirely different aspect, so that it does not seem advisable to go any farther (along) the way originally contemplated." Finally, even assuming that the bare facts and documents in evidence with regard to the transaction conducted by Schmidt in New York are at all susceptible of the construction which the defendant puts upon them, the fact still remains that three witnesses were available who could have so testified had it been the fact, and that Schmidt, the only one called, nowhere suggests that he departed from the agreement as he understood it.

13. The following facts all have evidentiary value and support the finding already made, that the trust agreement was not abrogated by Schmidt in New York: (1) The commission and discount on the borrowed money, amounting to $8,250.50, which the Guaranty Trust Company required to be paid in advance, was advanced to Woodman by the Deutsche Bank through Schmidt. It has never been repaid by Woodman either to the Deutsche Bank or to the Rumanian Corporation. (2) Although the price of the ship was $600,000, the Rumanian Corporation received only $598,000. Since all the stock of the Delaware Corporation was issued to Woodman, he thus got $2,000 of the stock, which was in exact accord with the Berlin agreement as to his remuneration for acting as trustee. (3) Schmidt, as reported in his letter of January 9, 1915, and as testified to

by him, immediately called Woodman's attention to the fact that in the case of The Dacia, the United States government had refused to accept responsibility in the event that that steamer should be seized by the English, and "emphasized" that in no event should the Steaua Romana be loaded without first having ascertained that war risk insurance was available. It may be noted that at the time of this letter the Steaua Romana had sailed from Bremen and was on the sea on her way to New York. References to her being loaded and sailing refer to her projected trip with a cargo of cotton from the United States to Germany. (4) In January, 1916, Schmidt, under orders from Von Stauss, urged upon Woodman the payment of a dividend from the earnings of the ship. Woodman declined to do so, preferring to use the profits for paying off his notes at the Guaranty Trust Company. The only interest the Germans could have had in a dividend was by virtue of the oral trust agreement. At this interview with Schmidt, Woodman neither denied the existence of such trust, nor claimed absolute ownership of the ship.

14. The Steaua Romana operated in trade under the American flag during the balance of the year 1915 and after. On February 18, 1916, Woodman paid the Guaranty Trust Company $127,936.82 upon his notes, and on February 28th, following, paid the balance and took up the stock of the Delaware Corporation which had been held as collateral. Upon the first payment the sum of $127,000 was transferred from the account of the Rumanian Corporation to the credit of the Deutsche Bank, upon Schmidt's guaranty to the Trust Company to hold it harmless in so doing. Schmidt was not notified of the payment of the balance until about April 5th, and the same arrangement was then made with regard to it.

15. About the same time, Schmidt learned from Janson, an agent of the Deutsche Bank, that Woodman through the Delaware Corporation had sold the vessel to a British Corporation. The information was correct. Woodman had sold and cleared a profit of $900,000 for the Delaware Corporation. Janson reported to Schmidt that Woodman would give him no explanation of the sale stating that "he was the only owner of this company, and that he had free disposal in every direction without limitation, that he could act and do what he liked, and that he was in no way responsible to anybody." On April 6, 1916, Schmidt communicated this information by radiogram to his principals, and

subsequently confirmed it by letter on April 12th.

16. Schmidt remained in America until July, 1920, but never received any reply, or any further communication relating to the vessel. He and Adams determined that, having no documents giving them any rights against Woodman, they had no means to proceed against him, and that an effort to do so would "only create bad blood without accomplishing anything." The difficulties of regular correspondence may be taken for granted. As he said, "the whole correspondence as a regular correspondence did not exist." He was therefore not surprised at failing to hear from Von Stauss and, in the absence of instructions, determined that no action ought to be taken upon his own responsibility. In 1920 he went to Germany and was in contact with Von Stauss in connection with a number of matters. The Steaua Romana affair was discussed briefly. Schmidt returned to the United States in February, 1921.

17. On June 29 and August 4, 1924, Von Stauss wrote directly to Woodman requesting settlement under what he referred to as the "gentlemen's agreement" between them. To these letters Woodman did not reply. This bill in equity was filed February 28, 1927.

18. The United States was at war with Germany from April 6, 1917, until October 18, 1921, although hostilities terminated with the Armistice. Von Stauss' estimate that "after the conclusion of the war a considerable period of time elapsed before business relations between Germany and the United States were restored to a basis which would enable them to take up the matter with A. C. Woodman," is undoubtedly correct. The affairs of the Deutsche Bank in which he was immersed were world-wide and enormously complicated, and the disorganization wrought by the war made prompt attention to all these claims almost impossible.

### Conclusions of Law.

█ First Conclusion of Law: The plaintiff's proof is in substantial conformity to the averments of the bill.

Discussion: The defendant's contention that the bill must be dismissed because the proofs do not conform to the allegations of his bill cannot be sustained. All that is required is substantial conformity. The case proved must be the case stated in the bill of complaint, and not a different one; but if this result is attained, departures from the allegations of the bills upon minor points

will not defeat the plaintiff's equity. The theory of the rule is unfairness or injustice to the defendant in requiring him to meet a wholly different case from that of which the pleadings have given him notice.

■ The bill avers that Von Stauss was duly authorized by the Rumanian Corporation to make the oral trust agreement with Woodman in its behalf. Assuming, but not deciding, that the plaintiff's proof fails to show such antecedent authorization, the departure would not defeat the plaintiff's case.

■ Even if the cause of action here were based upon the contract, which it is not, the question of Von Stauss' original formal authority from the plaintiff to contract for it would be of minor importance in view of the fact that the plaintiff by bringing this action has completely ratified what its agent did. Want of authority in the plaintiff's agent cannot be raised as a defense where the plaintiff ratifies by bringing suit, nor can it be availed of by indirection under the guise of a variance.

■ But the position of the defendant upon this point as well as upon the related point of want of mutuality of remedy is based upon what appears to be a misunderstanding of the nature of the legal rights and wrongs which bring the plaintiff into court. This is a bill to declare and enforce a trust. A trust may have its origin in a contract or arise contemporaneously with a contract, but in enforcing the trust the court is concerned with the protection of a property right (of an equitable nature), and, except as it may affect that property right by defining the interests and obligations of the parties under the trust, the contract is in no sense an element of the plaintiff's cause of action. See Williston on Contracts, § 348. Confusion manifested in many reported cases between rights and obligations arising out of a definitely established trust relation as to specific property rights and those arising from contract has seldom prevented the courts from reaching a proper result, but in this case the distinction is highly important.

■ The defense of want of mutuality insisted upon by the defendant has a place in cases of bills for specific performance of contracts, but it has nothing whatever to do with an executed trust and cannot be raised by a trustee who has taken over the trust property, administered it for over a year, sold it at a profit, and pocketed the proceeds.

The next question is whether the plaintiff comes into equity with clean hands. The answer to it involves two inquiries: First, whether the transaction out of which this trust arose was a fraud upon the registry laws of the United States; second, whether it was a violation of international law.

■ Second Conclusion of Law: No fraud upon the ship registry laws of the United States was involved in the provisional registry of the Steaua Romana in Bremen or her subsequent transfer to the American flag.

Discussion: As has been noted, the special affidavit of the vendee for the issue of provisional registry by consuls contains a statement that: "There is no agreement or understanding reserving to the vendor, or for his benefit, any interest in the vessel, or its operation, or right or voice or control therein." The defendant's contention is that this clause should be construed broadly, to cover an interest in the stock of a vendee corporation, such as the plaintiff acquired at the time of the transfer of the Steaua Romana. If the absence of such interest was a legal prerequisite to transfer and the affidavit was intended to cover that point, then the affidavit was false and the obtaining of provisional entry was a fraud and the plaintiff's case, necessarily depending upon the transaction, must fall.

But a review of the navigation laws of the United States and the construction given them by departmental practice leaves no doubt whatever that this term in the affidavit was inserted solely for the purpose of insuring a clear and unencumbered title in the American corporation which was to become the owner of the vessel, and that if such corporation was one created under the laws of the United States or of any state thereof the vessel was legally entitled to American registry without regard to who owned the stock either directly or indirectly.

The original Navigation Act of September 1, 1789 (1 Stat. 55), provided that no ship could be registered or enrolled unless it was owned by a citizen or citizens of the United States. Even an American owner of ships living abroad could not obtain registry unless an agent or partner in an American firm was in business in the country of his residence. By the Act of December 31, 1792 (1 Stat. 289, § 4 [46 USCA § 19]), a vessel owned by a citizen domiciled in a foreign country was given the right of registry provided the owner take an oath, "That there is no subject or citizen of any foreign prince or state, directly, or indirectly, by way of trust, confidence, or otherwise, interested in such vessel, or in the profits or issues there-

of." The requirement for this particular statement in the oath (originally intended only for citizens living abroad) was by the courts extended to all cases of registry by American citizens and was incorporated in all oaths for that purpose.

Neither of the two acts referred to made any provision for the registry of vessels owned by corporations. The Act of March 3, 1825 (4 Stat. 129), admitted vessels owned by corporations to registry upon an oath to be taken by the president or secretary as to the ownership of the vessel, "without designating the names of the persons composing such company." Section 4 (46 USCA § 254). A further requirement that the oath should contain a statement that "no part of such steamboat or vessel has been, or is then, owned by any foreigner or foreigners," was removed by the repeal in 1858 of the fifth section of the act. (4 Stat. 129; 11 Stat. 313).

This legislation was codified in the Revised Statutes, and substantially as stated (subject to the amendment by the Act of June 24, 1902, c. 1155, § 1, 32 Stat. 398 [46 USCA § 20], which so far as corporations are concerned re-enacted the provisions of the Revised Statutes as to the oath), was in force on October 31, 1914. It will be observed that the oath required in order to obtain registration was as to the absence of any foreign interest in *such vessel*, and in case of a corporation as to the ownership of *the vessel* without designating the names of the persons composing the company.

On July 11, 1911, the Attorney General had rendered an opinion to the Department of Commerce in which the law was carefully reviewed and fully and clearly discussed. The precise question involved was the enrollment in the coasting trade of a vessel owned by a New York corporation, most if not all of the stock of which was owned by Canadians. The opinion, however, relates to registry as well as enrollment and reaches the conclusion that, "a vessel belonging to a domestic corporation is entitled to registry, or enrollment, even though some stock of the company be owned by aliens."

Judge Rose in The Scandinavia II (D. C.) 258 F. 144, 145, states that this opinion of the Attorney General merely confirmed a long established practice of the executive departments of the government. He says that since 1858 they "have granted documents to vessels owned by a corporation organized under the laws of any of the states, without inquiry as to the nationality of its stockholders."

For confirmation of the fact that this was the construction adopted by the executive department of the government reference may be had (a) to the form of oath prescribed by the customs regulations of the United States in force at the time or shortly thereafter. See Customs Relations of the United States issued as of August 13, 1915, by the Secretary of the Treasury, art. 45, p. 45. Commerce Form No. 1263. (b) Correspondence between the Department of State and the British government relating to the seizure of the Kankakee, Hocking, and Genesee. These ships, admitted to American registry after a transfer to an American corporation from German subjects, were seized by the British and condemned by the Prize Court on the ground that their ultimate ownership was German. While there was some dispute as to the ultimate ownership, and while the State Department had declined to give assurances to the vessels before they sailed, the whole contention of American government throughout the correspondence postulates the legality of the American registry, regardless of the ultimate ownership of the corporate stock. See Supp. Amer. Jour. of Int. Law, vol. 10, p. 145; Garner, Prize Law During the World War, § 284, and note. (c) Reference may also be had to Law of Prize, Colombos, England 1926 (page 67). Referring to the American rule regarding corporations, the author says: "As regards corporations, American doctrine regards them as separate entities distinct and apart from the persons comprising them, * * * companies registered in the United States are treated as national even when controlled by enemy subjects. A similar principle applies to the character of a vessel, and considerations connected with the personal status of why owners are disregarded." See, also, Oppenheim, International Law, vol. II, p. 124.

The Act of Congress of August 18, 1914, 38 Stat. 698, is important only in that it removed an existing obstacle to the American registry of the Steaua Romana, namely, the fact that she was a foreign built ship. Many such vessels at the outbreak of the war were in foreign ports, registered perforce under the laws of foreign nations although in many cases owned either directly or indirectly by American citizens. The act was intended to protect the rights of the owners by enabling them to obtain American registry. In order that the new status might be acquired without delay the Secretary of Commerce, presumably acting under the authority of the Act of July 5, 1884, § 2, 23 Stat. 118, as amended (46 USCA § 2), issued instructions to Amer-

ican consuls for immediate provisional registry of vessels coming under the American flag, and in such instructions prescribed the form of affidavit which was taken in the case of the Steaua Romana. He of course had no right to prescribe any oath which the law did not authorize, and, in view of the existing law, it is clear that the oath actually required was not intended to disclose ultimate stock ownership by way of trust or otherwise in the corporation which took over the vessel.

■ Third Conclusion of Law: The transfer of the Steaua Romana on October 31, 1914, from the Rumanian to the American flag was not in violation of the law of nations, nor of the neutrality of the United States.

Discussion: The conclusion above stated is based upon the premise, which seems to me indisputable, that by the law of nations the vessel was, at the time her provisional registry was obtained, neutral. She was then owned by a corporation existing by virtue of the laws of Rumania, a neutral power. She was entitled to fly and did fly a neutral flag. If, from the standpoint of the allied powers, she was by reason of these facts a neutral and not an enemy ship and was not lawfully subject to capture and seizure by them, her transfer to another neutral flag did not, as the defendant put it, defraud the allied powers of any right to capture and seize the vessel, since no such right existed. And this is equally true, though it be conceded that the transfer was for the purpose of further concealing the ultimate German ownership of the stock of the corporation, in anticipation of an assertion of enlarged rights of capture and seizure by the allied powers.

Did the remote German interest in the stock of the Rumanian Corporation make the Steaua Romana an enemy ship? It is unnecessary to devote any prolonged discussion to the question whether there was any recognized custom or international agreement amounting to a rule of international law prior to 1908 fixing the neutral or enemy character of a vessel under similar conditions. In passing it may be noted that Professor Oppenheim states that, "The general rule before the World War with regard to vessels was that their character is determined by their flag" (International Law, vol. 2, p. 124), though he also says, "No doubt British practice formerly prevailing was said to recognize * * * an exception where a vessel sailing under a neutral flag was in part owned by an enemy subject," citing Hall, A Treatise on International Law, § 169; Holland, Prize Law, § 19; Westlake, International Law, vol. II, p. 170. Garner (Prize Law During the World War, p. 362, and note) says that there has been a divergence of opinion and practice between Great Britain and Continental Europe regarding the test of enemy character, Great Britain maintaining that the flag was conclusive only when it was an enemy flag and not conclusive if a neutral flag, in which case the domicile of the owner was held to be the true test. Hyde (International Law as Interpreted and Applied by the United States, § 783) points out that according to the Naval Instructions governing Maritime Warfare of June 13, 1917, the neutral or enemy character of a private vessel is determined by the neutral or enemy character of the state whose flag the vessel has a right to fly as evidenced by her papers, dating the rule back to the decision of the Supreme Court of the United States in 1866 in The William Bagaley, 5 Wall. 377, 410, 18 L. Ed. 583; Colombos (Law of Prize, § 51) says that the principle that the flag which the vessel is entitled to fly determines her character is an old one, but points out that the British Prize Courts conceived that they were entitled to inquire into the ultimate ownership. He states (section 56) that the American rule is in accordance with the general principle, citing The William Bagaley, supra.

However this may be, in 1908–1909 at a naval conference of the powers the Declaration of London was drawn up. The real purpose of the conference was to get some general agreement in preparation for a code of prize law to be administered in the proposed International Prize Court projected by the Second Hague Conference of 1907. The Declaration of London was signed by the powers at the conference, including England, France, Russia, the United States, and Germany, but never formally ratified by any of them. Article 57 of the declaration provided: "Subject to the provisions respecting transfer to another flag, the neutral or enemy character of a vessel is determined by the flag which she is entitled to fly * * *."

While not formally ratified, the declaration was, upon its signature, generally accepted as a statement of rules which would be observed by the signatory powers in the event of war. The preamble contained a statement to the effect that the signatory powers were agreed that its rules corresponded in substance with the generally recognized principles of international law. By Orders in

Council of August 20, 1914, Great Britain put the Declaration of London into effect so far as her Prize Courts were concerned and the other nations, including France and the United States soon followed suit.

It is true that Great Britain on October 20, 1915, and thereafter the other powers one after another, abrogated article 57; but this action, of course, had no effect upon the status of the Steaua Romana in 1914. It is also true that in one or two decisions (notably The Proton) British Prize Courts exhibited a tendency to construe article 57 while in force in such manner as to permit under certain conditions an inquiry into the ultimate ownership of the vessels flying neutral flags. The reasoning in The Proton has been the subject of criticism, and the view there taken had no general acceptance.

By virtue of article 57, in effect by the separate action of the belligerent powers, and by virtue of the generally accepted view among nations prior thereto that the Declaration of London constituted a statement of the rules of international law, and possibly by virtue of international law prior to the Declaration of London, the Steaua Romana was on October 31, 1914, a neutral vessel.

Articles 55 and 56 of the Declaration of London as well as various pre-existing rules of prize law relate to the transfer of *enemy* vessels to neutral flags immediately before and during hostilities and have no application whatever to this transaction. The fact that we are here dealing not with a belligerent vessel but a neutral vessel also distinguishes some of the decisions of the Supreme Court of the United States relied upon by the defendant.

I am unable to find the slightest taint of illegality in the transaction upon which the plaintiff's case is based, nor am I able to see anything morally wrong in the steps taken by those engaged in it to keep its essence a secret, or in any subterfuge which may have been adopted in order to make it difficult for British Prize Courts to find out who the remote owners of the vessel were.

■ Fourth Conclusion of Law: The plaintiff is not guilty of such laches as will preclude it from asserting its rights in this proceeding.

Discussion: The application of the doctrine of laches by courts of equity is not arbitrary or technical. The cases "proceed upon the theory that laches is not, like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced—an inequity founded upon some change in the condition or relations of the property or the parties." Galliher v. Cadwell, 145 U. S. 368, 373, 12 S. Ct. 873, 875, 36 L. Ed. 738; Ward v. Sherman, 192 U. S. 168, 175, 24 S. Ct. 227, 48 L. Ed. 391. " * * * Where a court of equity finds that the position of the parties has so changed that equitable relief cannot be afforded without doing injustice, or that the intervening rights of third persons may be destroyed or seriously impaired, it will not exert its equitable powers in order to save one from the consequences of his own neglect." Penn Mutual Life Ins. Company v. Austin, 168 U. S. 685, 698, 18 S. Ct. 223, 228, 42 L. Ed. 626. These are statements of the general rule.

■ To particularize and apply the doctrine: All courts are in agreement that lapse of time alone will not bar the plaintiff from asserting his rights. If long continued it may carry with it a presumption of injurious consequences but when the circumstances show the absence of such prejudice the mere time elapsed will not be effective. The rule of the statute of limitations is sometimes applied by analogy, but it is a convenient yardstick only. Though it may be useful in determining what length of time will presumptively be prejudicial to the defendant, it is not necessarily controlling and all courts, without exception, agree that in exceptional cases at least its arbitrary standard may be disregarded.

■ It is elementary that in cases of breach of trust the cestui que trust is not chargeable with laches until he has had direct knowledge of the breach or repudiation of the trust by the trustee, or until facts have come to his knowledge which ought to put him on inquiry and which, if reasonably investigated, would apprise him of the breach or repudiation. Schmidt's radiogram and letter in April, 1916, advising Von Stauss of the information relayed to him by Janson to the effect that Woodman had sold the stock, that he refused explanation, and claimed that he was in no way responsible to anybody, may be taken as the starting point in assessing the effect of the delay in bringing this suit. Although correspondence was uncertain, there is no reason to suppose that Von Stauss did not receive Schmidt's letter and I assume that he did. Of course Schmidt himself was not in a position to do anything about it other than notify his principals. So that from that point on the question must be considered from the

standpoint of the Rumanian Corporation and of the German interests involved.

The delay must be taken to have continued at least until 1924 in which year Von Stauss wrote Woodman two letters asking for a settlement, which letters were unanswered. If we were concerned solely with the statute of limitations, the actual bringing of the suit would of course be the only date of importance. In May, 1926, his brother, with an attorney, came to America to take the matter up with Woodman. He was unable to see Woodman at all, although he attempted to make various appointments with him. This bill in equity was filed February 28, 1927.

Discarding, for the time being, consideration of the German interests involved, Rumania entered the war on August 27, 1916. On December 6, 1916, the German forces occupied Bucharest. Thereafter until November 30, 1918, on which day the King of Rumania returned to his capital, the country was practically entirely occupied by the military forces of Germany. "Territory in the occupation of the enemy is dealt with on the footing of enemy territory being considered as part of the domain of the conqueror so long as he remained in possession of it. All persons domiciled within the occupied territory are consequently regarded as enemies." Colombos, Law of Prize, § 44. This rule was incorporated into our Trading with the Enemy Act, October 6, 1917, § 2 (a), 50 USCA Appendix, § 2 (a). Under the strictest possible interpretation of the law, therefore, the period of time while we were at war with Germany, during which Rumania was occupied by German forces would have to be deducted from the elapsed time.

Laches to bar relief imputes some degree of fault. This principle requires that the German interests in the plaintiff corporation be taken into consideration. Apparently the actual ownership of the stock passed out of German hands in 1920, but it appears that at that time there was reserved to one of the German corporations (The E. P. U.) an interest in a substantial portion of the proceeds of the trust here involved, and that such interest still exists. The war with Germany was not finally ended until October 16, 1921. During all this time German subjects and corporations had, for all legal purposes, an enemy character. German lawyers were of the opinion that the Treaty of Versailles did not restore German nationals to full privileges and protection in the countries of the allied powers. At least they had some ground for their opinion. If so it was not until the Treaty between the United States and Germany concluded in Washington, December 8, 1923, and ratified and proclaimed October 14, 1925 (44 Stat. 2132) that they were so restored. However this may be, it would be harsh and unreasonable to hold German nationals to the highest degree of promptness and expedition in prosecuting a claim of this nature against an American citizen who sold the subject of the trust to a British corporation.

All statements of the doctrine of laches are predicated upon prejudicial delay. Such prejudice may arise from expenditures upon the trust property, made by the adverse party who, by reason of the plaintiffs' delay, has good reason to believe that the alleged rights have been abandoned; or, as was pointed out in Hammond v. Hopkins, 143 U. S. 224, 12 S. Ct. 418, 36 L. Ed. 134, because of the difficulty of doing entire justice through the death of the principal participants or of witnesses, or by reason of the original transaction having become so obscured by time as to render ascertainment of the exact facts impossible. Great changes in values as in Kitts v. Hanna (C. C. A.) 29 F.(2d) 1013, may be a cause of difficulty and there may be various other impediments which lapse of time may place in the way of finding out the truth.

In the instant case there is absolutely nothing other than mere lapse of time to support the defense of laches. Such delay as has taken place weighs more heavily, if anything, upon the plaintiff than upon the defendant. I am unable to see a single point at which the defendant is at a disadvantage by reason of the plaintiff's delay. Apparently the only witness who had died is Janson, and if living, he could have added nothing which would make the facts relating to notice of the defendant's repudiation of the trust more favorable to the defendant than I have found them. Taking all the facts and circumstances into consideration the case is in my judgment clearly an exceptional one, which does not call for the ruthless application of the doctrine of laches.

No doubt there are occasions where the rule must be applied even in favor of a faithless or fraudulent trustee, but as was said by the Supreme Court in Ewert v. Bluejacket, 259 U. S. 129, 42 S. Ct. 442, 444, 66 L. Ed. 858, the equitable doctrine of laches was "developed and designed to protect good faith transactions against those who have slept upon their rights, with knowledge and ample opportunity to assert them. * * * "

I am satisfied that a gross fraud has been perpetrated by this defendant, that it was undertaken deliberately in the expectation that the difficulties which the plaintiff and its owners were under by reason of the war would probably prevent the assertion of their rights for a long time and possibly defeat them altogether, and that to apply the doctrine of laches now against this plaintiff would simply be working out the defendant's plan in accordance with his anticipation, and would convert this court into an instrument for carrying out his fraud and securing him in his possession of its fruits.

Fifth Conclusion of Law: The defendant became a trustee of all the stock of the Union Petroleum Steamship Company (the Delaware Corporation), other than the $2,000 worth belonging to him, and he thereafter held the stock under the terms of the agreement of trust as found in the facts.

Sixth Conclusion of Law: The defendant is liable to render a full and complete accounting of all dividends, incomes, and other profits, if any, derived or received by him from the stock of the Union Petroleum Steamship Company.

A decree in accordance with the foregoing may be submitted.